IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § § | |
| V. | § | CASE NO. 4:13cr67.4 |
| | § § § | |
| GUSTAVO ORTIZ-SALAZAR | § | |

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
REGARDING DEFENDANT'S MOTION TO SUPPRESS**

This matter having been referred by the Honorable Richard A. Schell (*see* Dkt. 129), the Court has considered Defendant's Motion to Suppress Statements (Dkt. 119). After considering the evidence and arguments presented at the hearing held on October 29, 2014, the Court finds that the motion should be GRANTED in part and DENIED in part.

Defendant is charged in this matter with conspiracy to possess with the intent to distribute heroin in violation of 21 U.S.C. § 846. In his motion, he seeks to suppress any oral statements he made to law enforcement or evidence discovered during border questioning at Chicago O'Hare International Airport on December 11, 2012. Defendant argues that the statements and/or evidence were obtained during a custodial interrogation without the administration of his *Miranda* warnings.

### AUTHORITY

The Fifth Amendment protects an individual's right to be free from compelled self-incrimination. Thus, the Government may use at trial only those confessions that are voluntarily made. 18 U.S.C. § 3501(a); *Malloy v. Hogan*, 378 U.S. 1, 6, 84 S. Ct. 1489, 12 L. Ed. 2d 653

1

(1964). To protect this right, statements obtained during a custodial interrogation of an accused cannot be used unless the accused has been advised of his right to remain silent and right to counsel. *Miranda v. Arizona*, 384 U.S. 436, 473 (1966). The requirement of *Miranda* that police advise an accused of his rights prior to questioning applies only if the accused is "in custody or otherwise deprived of his freedom of action in any significant way." *Id*. at 445; *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). The determination of whether a person is in custody for *Miranda* purposes must be made on a case-by-case basis considering all the objective circumstances. *Stansbury*, 511 U.S. at 323, 114 S.Ct. 1526. A suspect is "in custody" for the purposes of *Miranda* "when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *United States v. Courtney,* 463 F.3d 333, 337 (5th Cir. 2006) (quoting *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988)).

"[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 100 S. Ct. 1682, 1689–90, 64 L. Ed.2d 297 (1980). As such, when the subject of the questioning transformed from routine questioning to questions calculated and intended to elicit a criminally incriminating response, an interrogation is considered to have commenced for purposes of *Miranda*. *See id.*; *see also U.S. v. Chavira*, 614 F.3d 127, 133, n8 (5th Cir. 2010).

# EVIDENCE PRESENTED

At the hearing, the Government offered the testimony of Raymond Spiekerman, a Customs and Border Protection Officer at Chicago O'Hare Airport, who was working on December 11, 2012. Spiekerman testified that Defendant and another passenger on an incoming flight from Mexico were on a lookout list as possibly being connected to illegal narcotics.

Spiekerman testified that he conducted routine questioning of Defendant after Defendant retrieved his baggage. He asked Defendant questions such as: Was he traveling with anyone? Where had he been? What had he been doing in Mexico? Spiekerman testified that his partner, Officer Rivera, was acting as a translator. According to Spiekerman, Defendant had difficulty articulating where he had been and was evasive and ambiguous in his answers. Defendant stated that he had traveled alone and that he had traveled to Mexico to see his family and to go to a funeral. Spiekerman searched Defendant's backpack and found a Mexican voter's identification card and a parking ticket, which Spiekerman thought was suspicious because it did not have Defendant's driver's license number on it. Spiekerman knew this because driver's license numbers in Illinois start with the first letter of an individual's last name. Spiekerman testified that he also asked Defendant why he had a Mexican voter identification card, but Defendant was again evasive.

Spiekerman testified that a biometrics test was then conducted to confirm that Defendant was a U.S. citizen. The results were returned within approximately 15-20 minutes confirming Defendant's identity as a citizen.

Spiekerman then sought approval from his chief to conduct a pat-down of Defendant, given Defendant's evasive answers, the suspicious parking ticket, and his presence on the lookout list.

After the chief's approval, Defendant was taken to a pat-down room containing a table, bench, and toilet. Officer Spiekerman and Officer Rivera conducted a pat-down. Defendant was compliant during pat-down and was not restrained to Officer Spiekerman's knowledge and the door to the pat-down room was open after the pat-down was completed.

Spiekerman stated that he did not read any *Miranda* rights to Defendant (and never reads *Miranda* rights to any passengers) because his role is administrative and thus limited to routine questioning. According to Spiekerman, approximately 55 minutes elapsed from the time Defendant got off the plane until pat- down was finished. Spiekerman conceded that Defendant was not free to leave during his questioning.

*Secondary Inspection*

After Spiekerman finished the pat-down, a special agent with Homeland Security arrived to the pat-down room. Spiekerman testified that he left the room at that time and learned that the parking ticket in Defendant's backpack was connected to the other traveler with whom Defendant was associated on the lookout list, Araceli Gonzalez. According to Spiekerman, although he was not primarily responsible for any questioning after the pat-down concluded, records indicated that Defendant was released approximately 2 hours after the pat-down of Defendant.

The Government then offered the testimony of Special Agent Mike Cadman, the Homeland Security agent who continued interviewing Defendant after Spiekerman's pat-down. Cadman testified that he was called in by customs officers to speak with Defendant because the answers Defendant was giving about his travel were not making sense.

Cadman testified that he interviewed Defendant in the pat-down room. Cadman could not recall if he had a translator but agreed that several individuals he works with often help him translate. To the best of Cadman's recollection, he testified, the door to the pat-down room was open and the interview never became combative, nor were any weapons drawn. Other law enforcement officers came in and out of the room throughout the interview.

According to Cadman, his interview lasted approximately an hour to an hour-and-a-half. During this time, Cadman stated, Defendant was not free to leave. Cadman testified that he did not read Defendant his *Miranda* warnings because he was conducting a basic routine border examination. According to Cadman, if he were going to elicit incriminating statements, he would first read an individual his *Miranda* warnings.

Cadman testified that he asked Defendant questions such as where did he travel, with whom did he travel to Mexico, how did he travel to Mexico, where did he go, and what did he do in Mexico. Cadman stated that he also asked Defendant where he lived, with whom he lived, what did he do for a living, and how much money he made. Cadman stated that many of Defendant's responses didn't make sense and were inconsistent with other information law enforcement had.

Cadman testified that he repeatedly asked Defendant if he had any knowledge of Araceli Gonzalez. Defendant denied that he did but later changed his story when he was presented with the parking ticket linked to her. Defendant proceeded to tell Cadman about how he knew Gonzalez and their travel to Mexico.

Cadman testified that, to the best of his recollection, Defendant was not handcuffed during the interview. According to Cadman, he has never handcuffed anyone in the pat-down room. He

was not able to recall whether any other law enforcement handcuffed Defendant but did not believe that Defendant was physically restrained in any way during the interview. Cadman testified that his interview of Defendant was terminated after Defendant gave details about his travel in Mexico with Gonzalez and the investigation was closed.[1]

As for documentary evidence, the Government offered photographs of the materials Spiekerman removed from Defendant's backpack, including the suspicious parking ticket and the Mexican voter identification card, as well as photographs of the preliminary screening area and the pat-down room and its surroundings. Defendant offered a copy of the report of Investigation of Department of Homeland Security completed by Agent Cadman regarding the interview of Defendant.

## ANALYSIS

It is undisputed based on the evidence presented that Defendant was not read his *Miranda* warnings. Thus, the issue presented to the Court is whether he was subjected to a custodial interrogation such that *Miranda* warnings were required.

Having heard the evidence presented, the Court finds that the interview by Spiekerman was a routine border exam and that Defendant was not in custody for the purposes of *Miranda*.

---

[1] The Government also offered Special Agent Shannon Mulcahy with the DEA who testified that she did not participate in the interview in Chicago but that in her case report summarizing the airport interview she stated that Defendant was "released from custody." Mulcahy testified that she later learned that Defendant was never in custody. Given this testimony that Mulcahy has no first-hand knowledge of the interview, the Court finds that any argument by Defendant as to law enforcement's characterization of it in Mulcahy's report is irrelevant to the Court's analysis here.

"Routine citizenship checks at fixed checkpoints do not impose a degree of restraint associated with arrest because the detention is by nature brief and subject to the scrutiny of other travelers, the intrusion is limited in scope, advance notice obtains and visible signs of authority mitigate rather than enhance the perceived degree of restraint." *U.S. v. Bengivenga*, 845 F.2d 593, 599 (5th Cir. 1988). *See also U.S. v. Chavira*, 614 F.3d 127, 133 (5th Cir. 2010) ("We are aware of no law requiring customs officers to allow admission if the applicant refuses to answer these routine questions or produce relevant documents to show entitlement to admission.").

Having heard the testimony presented, the Court finds that Spiekerman's questions and search of Defendant's back pack and person were to determine if he was the U.S. citizen he claimed to be and whether he was entering the country with any contraband. Although Defendant was not free to leave, it was a relatively brief detention during which Defendant's identity was verified prior to entry into the country. The Court finds that a reasonable man in Defendant's position would not have been surprised that such questions would be asked. Therefore, Defendant's motion is DENIED as to any statements made to Spiekerman or evidence discovered during that interview.

As to the continuation of the questioning by Agent Cadman, however, the Court finds that Defendant was subjected to a custodial interrogation such that *Miranda* was implicated. As explained by the Fifth Circuit,

> "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980). *This is not the type of routine booking question* contemplated by *Pennsylvania v. Muniz,* 496 U.S. 582, 110 S.Ct. 2638, 2650, 110 L.Ed.2d 528 (1990). When the subject of the questioning

> transformed from routine questioning about immigration to questions calculated and intended to elicit a criminally incriminating response, the officers began *interrogating* Chavira for purposes of *Miranda. See Innis,* 100 S.Ct. at 1690 n. 7 (the intent of the police is relevant and may have bearing on whether the police should have known their words were reasonably likely to evoke an incriminating response).

*Chavira*, 614 F.3d at133, n. 8. The scope of Cadman's questioning exceeded the scope of questions relating to entry and transformed into matters intended to elicit incriminating responses. Critical to the Court's finding is that Spiekerman had already conducted a pat-down, which resulted in no contraband, and the biometrics confirmed Defendant's American citizenship.

"There was no reasonable immigration related purpose behind further questioning other than to elicit incriminating statements for potential prosecution." *Chavira*, 614 F. 3d at 133. What Defendant's profession was, how much he made, how long he had known Gonzales or when he decided to travel to Mexico have nothing to with his re-entry into the country.

As noted earlier, after Defendant initially denied knowing Araceli Gonzalez, law enforcement determined, while Cadman was interviewing him, that the parking ticket in Defendant's possession was issued to a car in her name. According to Camden's report "[w]hen confronted with this information, SALAZAR changed his story and stated he did know GONZALEZ because they were neighbors from the same town in Mexico." Defendant's Exhibit 7 at 2. The report further indicates that Defendant also changed his claim that he traveled alone to Mexico, admitting that he went to Mexico with Gonzalez.

Before Defendant stepped off the plane, Gonzalez was on a lookout list as a suspected narcotics courier. The Court finds that the continued questioning of Defendant as to his relationship

to her – questioning which lasted for more than an hour and questioning which resulted in inconsistent answers by Defendant – reasonably led to suspicion by law enforcement officers about criminal activity regarding narcotics trafficking and was reasonably likely to elicit incriminating information about narcotics trafficking. A reasonable person in Defendant's situation – especially after being confronted with the parking ticket in Gonzalez's name – would have realized that Cadman was asking questions other than those related to his entry into the country. Defendant was not free to leave, and he was compelled into an admission regarding his relationship with Gonzalez after he had repeatedly denied it to law enforcement. The nature and scope of the questioning by Cadman would indicate to a reasonable person in his situation that his freedom had been restrained to the degree associated with formal arrest. *Chavira*, 614 F. 3d at 134. He was in custody for the purposes of Miranda while being interviewed by Cadman, and the motion to suppress should be GRANTED as to as to any statements made to Cadman or evidence discovered during that interview.

## RECOMMENDATION

The Court recommends that Defendant's Motion to Suppress Statements (Dkt. 119) be DENIED as to any statements made to Spiekerman or evidence discovered during that interview and GRANTED as to as to any statements made to Cadman or evidence discovered during that interview. Within fourteen (14) days after service of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C.A. § 636(b)(1)(C).

A party is entitled to a *de novo* review by the district court of the findings and conclusions contained in this report only if specific objections are made, and failure to timely file written

objections to any proposed findings, conclusions, and recommendations contained in this report shall bar an aggrieved party from appellate review of those factual findings and legal conclusions accepted by the district court, except on grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. *Id.; Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

**SIGNED this 6th day of November, 2014.**

_____
DON D. BUSH
UNITED STATES MAGISTRATE JUDGE